UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

BARBARA STEWART

                              Plaintiff,

    -against-

MICHELE STEWART
aka Michele Bouman-Stewart

                              Defendant.
_____

**AFFIDAVIT**

Civ. No. 1:18-V-201

**STATE OF NEW YORK**    )
                                     )
**COUNTY OF NEW YORK**  )

      DAVID P. MARCUS, being duly sworn, deposes and says:

      1.    I am an attorney at law duly licensed to practice in this State and admitted to practice before this Court.   My law firm, along with HOGANWILLIG, PLLC, are attorneys for plaintiff, BARBARA STEWART (hereinafter "plaintiff" or "Barbara"), and as such, I am familiar with the facts and circumstances of this matter.  I make this affidavit in opposition to Michele Stewart's Motion to Dismiss.

      2.    The facts asserted in this affidavit are based on information learned during investigation in this case, and documents and testimony elicited and produced during discovery, depositions and hearings on prior matters involving one or more of the parties to this case.  The exhibits attached herein are true and accurate copies of documents contained in my law firm files, including relevant portions of transcripts and exhibits marked at depositions and/or marked or received into evidence at various prior hearings involving one or more of the parties to this case.

Portions of some exhibits have been shaded grey for quick reference to relevant information addressed herein. The shading is computer generated, and not in the original document, but does not alter the substance or text of the document in any manner.

## COUNTER-STATEMENT OF FACTS

I.  **Defendant's Residence, Employment And Contacts with New York State**

   A. **New York Contacts At The Time Defendant Agreed To Act As Fiduciary**

3. Plaintiff's son William Stewart III ("Tres") married defendant, (at the time named Michele Bouman) in 1990. After the marriage, defendant moved in with Tres to his apartment on 59th St. in New York City. The couple resided in New York until October 1994, when they moved to Switzerland. *See* affidavit of William Stewart, III, attached herein, at ¶ 2 (hereinafter "Tres affidavit").

4. At the time of their marriage, Tres and plaintiff's family had amassed substantial wealth from W.P. Stewart Co., Inc., an New York investment company on Madison Avenue formed and run by Tres' father, William Stewart, Jr. ("Bill"). Much of the Stewart family wealth had been placed in trusts for each of plaintiff's four children, including Tres. The trusts were created in 1987 with the purpose of minimizing the Stewart family tax burden, a goal that was important to Bill. Bill, who appointed himself trustee of all four trusts, used trust assets for his and Barbara's benefit at his discretion, intending that the principal assets be transferred to the children with minimal or no tax consequences on his and Barbara's death. *See* Bill e-mail, attached at **Exhibit A**. The trusts were created in New York and were governed by and determined in accordance with New York law. *See* relevant portion of 1987 Tres trust, attached herein at **Exhibit B**.

2

5.  Around the time of the marriage, defendant obtained her Green Card and, once in New York, she almost immediately began employment for W.P. Stewart Co. Inc., and accordingly paid New York State and New York City income taxes on her earnings. (Tres affidavit, ¶ 3).

6.  In 1994 Barbara owned approximately $100,000 in jewelry and the Stewart family wealth was increasing rapidly. Bill, who made all the financial decisions for the family, was concerned that if tragedy struck plaintiff, the IRS would take one-half the value of plaintiff's growing jewelry collection in estate tax. Bill's concern was heightened in that plaintiff was spending a substantial amount of time doing charitable work in Vietnam and other third world countries, which presented some risk. *See* relevant portion of transcript of marital hearing testimony, attached herein at **Exhibit C**.

7.  Bill notified plaintiff that he directed the Stewart's attorney, John Iglehart, an American born lawyer practicing in Geneva, Switzerland, to place the jewelry in trust to avoid taxation on these assets at the time of plaintiff's death. *Id,* at p. 448. Iglehart had expertise in setting up foreign and offshore companies, and he was trusted by plaintiff and Bill. *See* affidavit of Barbara Stewart, at ¶ 3 (hereinafter "Barbara affidavit"). Plaintiff was informed that Iglehart created a company called Topaze to take legal ownership of the jewelry. (Exhibit C, at p. 448).

8.  Although plaintiff was not shown the corporate documents, she was led to believe that defendant was entrusted to safeguard the jewelry. *See* Barbara affidavit, ¶ 3. As will be discussed more fully below, that belief is confirmed by a fiduciary agreement entered into by defendant, as well as defendant's own written admissions.

9.  Plaintiff believed that the arrangement was a tax device for estate planning purposes, and that it would have no impact on her ability to use and control the jewelry as she wished during her lifetime. Plaintiff, who was not financially astute and deferred financial

3

decisions to her husband and his lawyers, was not privy to the discussions regarding her jewelry. Upon information and belief, however, defendant, as the appointed fiduciary, necessarily would have been notified of the plan of action and consented to it. On February 10, 1994, while defendant's legal residence was the 59th St. apartment in New York City, attorney Iglehart faxed a letter to Bill advising that he was redrafting the fiduciary agreement for Topaze and requested defendant Michele Bouman's address. *See* attached **Exhibit D**.

### B. Defendant's Continuing Contacts With New York State

10. Defendant continued to be employed with W.P. Stewart Co., Inc. after she moved to Switzerland. *See* Tres affidavit, at ¶¶ 3-4 and Exhibits attached therein. According to defendant's LinkedIn page, she was an "Assistant to the CEO and Family Office" of W.P. Stewart & Co., Inc. for 24 years between 1991 and 2015. *See* attached **Exhibit E**.

11. Defendant's pay stubs from 2002 and 2005 reflect wages paid from W.P. Stewart Co, Inc's principal office at 527 Madison Ave, New York, and show that Federal and New York State taxes were being withheld. *See* Tres affidavit, Exhibit A. An e-mail from Bill to his accountant dated May 13, 2006 states that Michele was still on the "family payroll," earning $130,000 per year at the time. According to the e-mail, the accountant had recommended that defendant thereafter be paid out of a different family business called Shamrock, a New Jersey corporation. *See* attached **Exhibit F**.

12. In addition to her work for W.P. Stewart, Inc., defendant started her own interior design company called Bouman Interiors, which she lists on her LinkedIn page as having a New York City address (written "NYC") from 2001 to 2011. Bouman Interiors performed work for the Stewart family, both in New York and in other countries. In 2002, Bouman Interiors invoices to W.P. Stewart Group of Companies depict a large contract to furnish four houses in Bermuda owned

4

by the Stewarts or their trusts. *See* attached **Exhibit G**. Accounting records from the Stewart Family Office evidence payments made to Michele Stewart for "Decoration Work" performed on December 31, 2006 at the New York City apartment owned by the trusts on 59th St., and payments totaling over $65,000 in March 2006 for "Furnishings" of Apt. 11A and another apartment owned by the Stewart trusts in New York City. *See* attached **Exhibit H**. An August 2007 journal entry reflects a debit of $1,100 for "Tax & Accounting Services" for Michele Stewart and a debit of $1,483 for "Tax & Accounting Services" for Bouman Interiors. *See* attached **Exhibit I**.

13. Defendant's LinkedIn page also lists herself as a Model for Ford Models, Inc. between 1987 and 1991 in New York City (also written "NYC").

14. A letter from defendant to plaintiff displays her strong interest in continued employment in The United States, and her connection with New York State. In an undated letter to plaintiff believed to be written in 2006[1], defendant wrote: "I do know that I need to be paid by a US company, not a private person, and pay my usual taxes (NYS, NYC, SS, etc.) in order to keep my green card status…. I was wondering whether I could be paid thru (sic) Shamrock/Trust just like [Gregory's wife]?" *See* attached **Exhibit J**.

15. Defendant's request was approved, and in May 2006, her salary was increased to $130,000 per annum. *See* attached **Exhibit UU**. Defendant's salary continued—and was even increased—shortly thereafter. In a letter from Bill dated September 14, 2008, he notes that defendant continues to be paid a salary by the "family office", which, including her bonus, amounts to $140,000 per annum *after* taxes. *See* e-mail, attached as **Exhibit K**.

---

[1] The letter states defendant has been on her own for 6 years. As she and Tres were separated in 2000, that would date the letter to 2006. It is also likely that this letter prompted the 2006 e-mails raising defendant's salary and paying her through Shamrock, discussed below.

16.     More recently, on March 8, 2015, defendant wrote an e-mail to plaintiff asking plaintiff to write her a letter of recommendation in light of the "over 20 years" she worked for plaintiff. Defendant pointed out that she has no work experience in Switzerland, and that, through Bouman Interiors, she decorated and/or renovated the family's New York Apartments 40E and 11A on 58th and 59th streets. *See* e-mail, attached herein at **Exhibit L**.

### C.     Defendant's Consent To Jurisdiction of The New York Courts And Initiation Of Lawsuits In New York State

17.     In December 1998, Tres and defendant entered into a Post-Marital Agreement that addressed the rights and obligations of the parties with respect to each other and Tres' trust. The parties agreed that the agreement would be governed, construed and enforced pursuant to the laws of the State of New York, without regard to the present or future domicile of either of the parties. *See* relevant portion of Post-Marital agreement, attached at **Exhibit M**.

18.     In April 2000, defendant and Tres separated, and defendant commenced divorce proceedings in October 2000. In the interim, on August 18, 2000, an Amendment to Tres' Trust agreement was executed. That Amendment, governed by New York law, provided that defendant would be entitled to one-half of Tres' trust upon the earlier of his death or the death of both of his parents. *See* relevant portion of Second Trust Amendment, attached herein at **Exhibit N**. Balance sheets prepared by Stewart Family accounting personnel reflect that Tres' trust was worth over $99 million dollars around this time. *See* attached **Exhibit O**.

19.     In 2000, W.P. Stewart Co., Inc. went public, and was listed on the stock exchange. The resulting explosion of wealth caused conflict among the family members that tore at deep and long-standing wounds between them. Around May 2004, plaintiff was added as a co-trustee of

her and Bill's children's trusts. In November 2004, Bill filed a Petition for Divorce in Bermuda, which he withdrew shortly thereafter.

20. In June 2006, Tres filed a Petition in Surrogate's Court, New York County seeking removal of both plaintiff and Bill as trustees of his Trust[2]. Tres' Petition alleged in part that his Trust held assets valued at the time at $90 million and he rejected the legitimacy of the 2000 Trust Amendment that purported to give defendant herein rights to his Trust. In September 2006 Barbara countered that the Trusts were a sham and she sought an Order imposing a Constructive Trust on the trust assets and further directing that the Trust be set aside and legal title revert to her and Bill.

21. On March 28, 2007, plaintiff received a letter from the law firm of Cohen Lans LLP, notifying plaintiff that defendant in this case asked them to represent her in the pending Surrogate's Court dispute in which plaintiff was seeking imposition of a constructive trust over Tres' Trust assets. The letter requested plaintiff's consent to their representation of Michele Stewart in that Cohen Lans had represented plaintiff in the past and there was a conflict of interest between plaintiff's assertion of a constructive trust and Michele Stewart's claimed interest in the Trust assets pursuant to the 2000 Amendment. *See* attached **Exhibit P**.

22. Counsel's letter to the Court on April 5, 2007 enclosed a Notice of Appearance in the Surrogate's Court Trust litigation in New York and made clear that defendant herein was seeking to protect her interest in that $90 million Trust. Following filing their Notice of Appearance, defendant's counsel appeared at hearings, served discovery demands and made motions seeking counsel fees. *See* relevant portions of various pleadings, attached at **Exhibit Q.**

---

[2] Various other Petitions were filed by other siblings both before and after Tres' Petition was filed, and all Petitions were consolidated.

7

23. Barbara's constructive trust claim went to hearing in July 2008. The Referee recommended rejecting plaintiff's claim in a decision dated November 2008, and that recommendation was confirmed by the Surrogate in July 2009.

24. Litigation of the Petitions continued on the remaining issues. Once again, defendant retained New York counsel to defend her claimed interests in Tres' Trust. *See* Notice of Appearance dated October 30, 2009, attached at **Exhibit R**. Defendant, through counsel, actively participated in that matter, including conducting depositions. *See* relevant portions of deposition transcripts, attached herein at **Exhibit U**. The remaining issues asserted in the Petitions were tried in January 2010. On November 8, 2010, the Special Referee made his recommendations, including a recommendation to remove plaintiff as a trustee of all Trusts but to maintain Bill as a trustee. That recommendation was confirmed by the Surrogate on December 1, 2011. The issue of defendant's interest in Tres' Trust was not, however, decided at that hearing and has not, to plaintiff's knowledge been determined to date[3].

25. From 2000 through part of 2008, defendant and Tres were engaged in divorce proceedings in Switzerland. During those proceedings, defendant contended that Tres had tens of millions of dollars in assets in his trust, and that she owned limited assets. As for plaintiff's jewelry, defendant did not list that as a marital or separate asset owned by her. Notably, to the contrary, she admitted in that proceeding that she was holding that jewelry for plaintiff. *See* Tres affidavit, at ¶ 8.

26. In 2008, Tres, at the time residing in Connecticut, obtained an unopposed judgment of divorce in that State. *See* Tres affidavit, at ¶ 11. Defendant thereafter amended her claims in

---

[3] Presumably, that issue would be ripe on the death either of Tres, or after both his parents are deceased.

8

the Swiss Court, seeking a money judgment against Tres, who was no longer represented by counsel in those proceedings. Following a hearing on May 3, 2012 in which Tres did not appear personally or through counsel, a "Decree By Default" was entered on August 23, 2012 by the Civil Court in the Swiss Canton of Vaud in favor of defendant and against Tres, awarding defendant a judgment against Tres for over 1.2 million Swiss francs. *See* Default Decree, attached at Exhibit C to Tres affidavit.

27. In February 2015, defendant retained the New York law firm of Meyer and Landis LLP to commence an action against Tres in Supreme Court, New York County seeking the entry of a judgment in the amount of 1,208,404.60 Swiss francs, in U.S dollar equivalence. The action was commenced in New York State by Summons with Notice of Motion For Summary Judgment In Lieu of a Complaint against Tres, a Connecticut resident. Venue was based on the location of assets owned by Tres in trust. *See* Summons with Notice, attached at **Exhibit S**.

28. Counsel for Ms. Bouman submitted a Memorandum of Law citing New York law and asking the Court to enter judgment in the New York courts for enforcement in this State. *See* MOL, attached at **Exhibit T**. Tres unsuccessfully contested the claim, and on July 28, 2015, judgment in the amount of $1,294,988.10 was entered with the New York County Clerk in favor of defendant and against Tres. *See* Judgment, attached at Exhibit D to Tres affidavit. That judgment has not been satisfied, and defendant currently is in negotiations involving Mr. Iglehart and Bill, a New York resident, to resolve the outstanding judgment. (Tres affidavit, at ¶ 11).

II. **DEFENDANT'S ACCEPTANCE, ACKNOWLEDGEMENT & PERFORMANCE OF HER FIDUCIARY DUTIES**

29. Plaintiff was informed of the Topaze arrangement, but was not provided specifics of the corporate or fiduciary details and was not provided with copies of any of the legal

9

documents. She was content to trust Bill, attorney Iglehart and defendant to establish whatever corporate entities were deemed necessary to ensure the jewelry ultimately passed outside of her estate, thereby reducing or eliminating the future tax burden. Following the birth of plaintiff's granddaughters, in 1994 and 1998, plaintiff's wishes were discussed with defendant, and it was made clear that the jewelry should be passed on to plaintiff's granddaughters after her death. (Barbara affidavit, at ¶ 5)

30. All of the jewelry was purchased in New York or Hong Kong, with the most expensive pieces being acquired at Harry Winston in New York. (Barbara affidavit, at ¶ 4). After defendant moved to Switzerland, many of the expensive pieces were relocated to plaintiff's Bank vault in Switzerland. Defendant was given a Power of Attorney over plaintiff's bank accounts and had unfettered access to the Bank vault housing these pieces of jewelry.

31. On numerous occasions over the years, plaintiff and defendant discussed her jewelry and plaintiff's expectations that it be passed on to her granddaughters. *See* Barbara affidavit, at ¶ 5. Many of these conversations were face-to-face meetings that occurred in New York during defendant's frequent trips to New York City. *See id.*

32. Defendant also openly discussed her "responsibility" for the jewelry and made mention of the company Topaze with her now ex-husband, Tres. *See* Tres affidavit, at ¶¶ 5-6. Defendant also acknowledged to Tres that she understood that the jewelry was meant to be passed on to plaintiff's granddaughters on plaintiff's death. *Id.*, at ¶5.

33. Defendant continued to work for W.P. Stewart, Inc. and to carry out her fiduciary duties towards plaintiff's jewelry long after she was separated from Tres, who had moved back to the United States. Tres affidavit, at ¶ 7. In November 2003, plaintiff e-mailed her son, Gregory, who assisted Bill in administering the trusts. Plaintiff wrote to Gregory that John Iglehart, who

10

assisted defendant in managing the jewelry, (*see* Tres affidavit. at ¶ 6) was asking about payment for the jewelry insurance. Gregory in turn forwarded the e-mail to defendant, with a handwritten note that included his comment "To pay <u>current</u> pol. [policy] premium of $<u>74k</u>. Michele to research and obtain <u>new</u> pol. [policy] for Jewelry—<u>with off premises coverage</u>" (emphasis in original). *See* attached **Exhibit V.**

34.     Less than two months prior to the above e-mail exchange, Mr. Iglehart faxed a letter to plaintiff with a reference line "Topaze Jewelry Insurance". The letter, addressed to plaintiff, was succinct, stating only that "[a]<u>s requested by Michele</u>, find attached the list of <u>your</u> jewelry insured" (emphasis added). *See* attached **Exhibit W**. The attached jewelry list detailed fourteen pieces of jewelry with a total value of over $7.5 million. Bank records dated June 11, 2003 evidence that Mr. Iglehart had authorized a payment of $73,516 from plaintiff's UBS account listing the details of payment as "Topaze", presumably for the jewelry insurance. *See* attached **Exhibit X**.

35.     The following year, Bill purchased a pair of Platinum and Gold Ruby & Diamond Earrings for Barbara at Harry Winston. The invoice, dated May 3, 2004 has a handwritten note "Gift – to BKS", which is plaintiff's initials. *See* attached **Exhibit Y**. The day after the purchase, a fax was sent from W.P. Stewart to defendant Michele Stewart with a reference line "Mrs. Stewart's Jewelry". The fax noted the purchase of the jewelry and stated "[p]lease have this piece added to the <u>Topaz</u> insurance policy." (emphasis in original). *See* attached **Exhibit Z**.

36.     Another expensive piece of jewelry, an emerald and diamond bracelet purchased for over $2 million, also was bought as a gift for plaintiff, as the handwritten notation on the invoice indicates. *See* emerald bracelet invoice attached at **Exhibit AA**. As will be discussed below, both

11

of these pieces of jewelry were placed in defendant's care and control as fiduciary for the beneficiaries of Topaze, but not given to defendant as a gift.

37. Indeed, there were gifts of jewelry given to defendant, but these gifts were separate and distinct from jewelry that was placed in defendant's trust in Topaze. Detailed journal entries and accounting records reflected the distinction. In 2002, for example, plaintiff and Bill purchased a Ruby and Diamond Necklace as a gift for defendant. Stewart family accounting records reflect the date of the deposit and final payment, both entries notating that the purchase was a "Gift to Michele Stewart". *See* journal entries, attached as **Exhibit BB.** In contrast, plaintiff's General Ledger records a note on December 31, 2003 stating "ADJUSTMENT—AS PER BKS, JEWELRY IS OWNED BY TOPAZ, INC. (IRISH CORP.)". *See* Gen. Ledger, attached herein at **Exhibit CC.** The distinction was also noted in e-mails among the Stewart family members and their accounting and bookkeeping staff. *See, e.g.*, e-mails from plaintiff and Bill dated April 24 and 25, 2004, attached herein at **Exhibit DD**.

38. On June 24, 2012, plaintiff e-mailed defendant and requested that she give the ruby earrings held in trust in Topaze to her son Tres, who was going to be in Switzerland. These earrings were purchased in 2004 for $1.1 million (*see* Exhibit Y). Defendant's response acknowledges her fiduciary responsibility and plaintiff's legal interest in the jewelry: "Sure. I'll have him sign a receipt for them. Please remember that the earings (sic) are NOT insured so once Tres signs the receipt and receives the earings (sic), it will terminate any responsability (sic) I may have towards the jewelry". *See* attached **Exhibit EE** (emphasis in original).

39. Four months later, in October 2012, plaintiff instructed defendant to remove the emerald bracelet from the vault and give it to a representative of hers to bring to plaintiff. Defendant's response leaves no doubt that she understood her fiduciary responsibilities towards

12

the jewelry located anywhere, including New York State, and that she had maintained a list of that jewelry so as to comply with her fiduciary obligations. The response also tacitly, if not expressly, acknowledges plaintiff's legal rights to the jewelry:

> Kindly email me a list of the jewelry you have kept with you in New York for the past few years as well as a picture of each item in order to comply with the fiduciary responsability (sic) that I have towards the company.
> In the event you have given part or all of that jewelry away, kindly list them as well as the names of the people you have given them to.
> Once your list matches the one DGBF has, I will take your request into consideration.
> Also, for future reference/planning, would you please tell me how many more gifts to DGBF/your granddaughters are you planning on taking back?

*See* e-mails, attached herein at **Exhibit FF**.

### III.   DEFENDANT'S CONCEALMENT OF THE TRUTH AND INJURY TO PLAINTIFF

40.   In January 2007, plaintiff commenced an action for Divorce against Bill in Supreme Court, New York County. Litigation was acrimonious and critical issues were strongly contested. Plaintiff asserted that Bill was secreting tens of millions of dollars of marital assets in offshore accounts managed by Mr. Iglehart, and Bill in turn contended that plaintiff possessed nearly $10 million in jewelry that equaled his net worth, negating her claim for distribution of any assets he owned. Resolution of critical disputed issues depended on facts and documents within the knowledge and possession of attorney Iglehart and/or defendant. Notably, at this time Mr. Iglehart was also representing defendant. *See* relevant portion of divorce hearing transcript of Bill Stewart, attached at **Exhibit GG**.

41.   Bill denied that he secreted any assets offshore, and plaintiff countered that her jewelry was owned by Topaze, not her, and that company was created at Bill's insistence to avoid estate taxes. Barbara insisted that the jewelry was turned over to defendant as part of Bill's tax

saving plan, and that it was destined ultimately for her grandchildren. Only Mr. Iglehart and defendant were in a position to provide the facts and documents that would solve the standoff.

42. Following the removal of plaintiff as co-trustee of the children's trusts, however, Bill completely and exclusively controlled all trust funds, which represented the greatest percentage of the family wealth. Bill continued to employ Mr. Iglehart, who did not participate in the case other than to write a letter denying that Bill had a financial interest in an offshore account managed by Iglehart and associated with Bill. Bill, through the Stewart Family office and/or Shamrock, also continued to employ defendant.

43. During litigation of her divorce case, Barbara requested information and documentation regarding Topaze from defendant and Iglehart, her lawyer for many years. Both were essentially non-responsive, and provided no meaningful information Barbara needed to establish the creation of Topaze. *See* Barbara affidavit, at ¶ 7.

44. On September 3, 2009, plaintiff sent an e-mail to defendant asking defendant to follow up with Mr. Iglehart for information about Topaze. Defendant forwarded the e-mail to Iglehart that same date, asking "[w]hat should I answer BKS?" She signs the e-mail "xoxoxo, M". Iglehart's cryptic response to defendant acknowledges the existence of Topaze and DGBF as well as the connection between those entities and plaintiff's jewelry, but provides little more detail. The e-mail strongly suggests that defendant remain silent. *See* e-mail, attached at **Exhibit HH**. Indeed, plaintiff has no record of either defendant or Iglehart responding to that e-mail[4].

---

[4] The e-mail was obtained in 2017 when, after years of requests by plaintiff for her files, Iglehart finally produced those files for her. The e-mail in question was contained within those files.

14

45. The above e-mail established the close relationship between Bill's lawyer John Iglehart and defendant, which, as noted, included Iglehart's legal representation of defendant. (Exhibit GG)

46. Iglehart does write an e-mail to plaintiff on April 16, 2010 stating that "according to my records, you are not the legal owner of Topaze/DGBF." *See* attached **Exhibit II.** The letter, however, is silent as to what Topaze or DGBF is or whether it has any connection to the jewelry, and the nature of plaintiff's interest in the jewelry. It also notably does not address a critical issue at issue in the hearing—namely Bill Stewart's involvement in setting up Topaze and the fiduciary arrangement, which Barbara contended prompted the transaction.

47. Testimony commenced in the marital trial before the Special Referee in March 2011. The hearing concluded on October 27, 2011, following 18 days of testimony. Ownership and value of plaintiff's jewelry was the one of the issues addressed by the parties. Towards that end, the Court appointed a forensic accounting firm to value assets of the parties, including the jewelry.

48. In his opening statement, Bill's counsel argued that plaintiff's contention that she had transferred ownership of her jewelry was unsupported with any documentation. *See* relevant portion of hearing transcript, attached at **Exhibit JJ.** Plaintiff testified on March 16, 2011 that she did not own the jewelry in question because it was given to Topaze, at the insistence of Bill for tax purposes. (Exhibit JJ, at p. 448). Plaintiff stated that Topaze was formed by attorney Iglehart at Bill's insistence and direction, and that the jewelry was given to Topaze through defendant to remove it from plaintiff's estate. (*id.*).

49. The Court-appointed forensic accountant, Stacy Collins, prepared a report dated February 18, 2011. Her report details her frustration with the inability to obtain the information necessary to render her opinion:

> We understand Topaze Investments, Ltd. ("Topaze") and DGBF Holdings "are located in Switzerland though Topaze is an entity that is domiciled in the British Virgin Islands. In April 2010, we received an email forwarded by [plaintiff's counsel] that was sent to Barbara Stewart by John Iglehart, an attorney based in Switzerland. The email indicated that according to Mr. Iglehart's records, Ms. Stewart was 'not the legal owner of Topaze/DGBF'. Our efforts to communicate directly with Mr. Iglehart were unsuccessful. We have been unable to obtain virtually any information concerning Topaze Investments Ltd. and DGBF Holdings. Accordingly, we have not expressed any conclusions or performed an analysis of either Topaze or DGBF Holdings.".

*See* relevant portion of Collins Report, attached at **Exhibit KK.**

50. Ms. Collins testified on March 25, 2011 that she understood that Topaze and DGBF were "holding companies that may have held jewelry that the parties owned. I say may because I never saw a balance sheet or documents that would confirm that." *See* relevant portion of Collins testimony, attached at **Exhibit LL**, at pp. 267-68. Ms. Collins testified that she received a copy of the April 16, 2010 e-mail from Mr. Iglehart (Exhibit II) stating that plaintiff was not the legal owner of Topaze, but that neither defendant nor Mr. Iglehart responded to her inquiries about Topaze and DGBF (Exhibit LL, pp 269-270; 368-69). When asked whether she e-mailed defendant because she's the owner of Topaze, Ms. Collins responded that "she may be the owner. I don't know. I haven't been able to verify anything". *Id.* at p. 369. She further testified that Bill informed her that he did not have an ownership interest in Topaze and he thought DGBF had been disbanded. Since Ms. Collins was unable to obtain any information on those entities, she did not express any conclusions or perform an analysis. *Id.*

16

51. Bill testified on July 7 and October 25, 2011. *See* relevant portions of Bill Stewart testimony, attached herein at **Exhibit MM**. Bill denied any knowledge of jewelry being transferred to Topaz or that he prompted plaintiff to do so. Bill was also repeatedly asked whether he saw any documentation forming the Topaze corporation or confirming plaintiff's allegation that her jewelry was transferred to that company. Bill denied seeing any such documentation and also denied having any interest in Topaze. *Id.*, at pp. 2154, 2161 and 2173. He testified that the jewelry was owned by Barbara. *id.*, at pp. 2154, 2156 and 2161.

52. At the conclusion of the hearing, the Special Referee issued his Report & Recommendation. The Referee's recommendations were largely adopted by the Court, which issued its Decision & Order on January 10, 2014. The Referee's Findings and Recommendations regarding plaintiff's jewelry were summed up by the Court as follows:

> The Report found that the Wife had failed and refused to provide information and documentation during this litigation about marital jewelry in her possession and control. … The Report rejected the Wife's claims that she transferred jewelry in her possession to an entity called Topaze, and no longer had an ownership interest in those items. In view of the Wife's failure to provide information and documentation about this marital asset, it recommends that the Husband receive a credit in equitable distribution for 65% of the appraised value of the jewelry, or $5,538,000.

*See* relevant portion of Decision & Order dated January 10, 2014, attached at **Exhibit NN**.

53. In large part due to the Referee's finding that the jewelry was owned exclusively by plaintiff, and the parties would thereby be in a similar financial situation, the Referee also recommended against any award of maintenance. *Id.*, at p. 23.

54. The Court adopted the Referee's finding that plaintiff secreted millions of dollars' worth of marital jewelry, and rejected her claim that the jewelry was placed in Topaze. *Id.*, at p. 26. She accordingly awarded the value of that jewelry to plaintiff (*id.*, at pp. 30-31) and confirmed the recommendation that plaintiff receive no maintenance. *Id.*, at p. 34. A Judgment of Divorce

17

was entered on April 30, 2014, and plaintiff appealed to the Appellate Division, First Department, which affirmed the Trial Court's Decision and Order on November 17, 2015.

### IV. DEFENDANT'S WRONGFUL TAKING OF THE JEWELRY

55. On October 28, 2013, frustrated with Mr. Iglehart's clear and growing conflict of interest due to his continued representation both of Bill and more recently of defendant, plaintiff terminated her attorney-client relationship with him, and retained new Swiss counsel. *See* attached **Exhibit OO**.

56. On April 29, 2014, plaintiff retained Swiss counsel to, inter alia, obtain an accounting of her jewelry and to recover physical possession of those pieces that were under defendant's control. *See* untranslated letter from Fiechter, attached at **Exhibit PP**. On May 22, 2014, defendant's counsel rejected plaintiff's request, contending that since plaintiff stated in her divorce case that she gave the jewelry to Topaze, and because defendant is the owner of Topaze, plaintiff has no right to return of the jewelry. *See* untranslated letter, attached at **Exhibit QQ.**

57. Plaintiff thereafter, on July 3, 2014, filed a criminal complaint in Switzerland against defendant for breach of trust and mismanagement because of her refusal, as fiduciary, to return plaintiff's jewelry. When the Prosecutor refused to prosecute the claim, plaintiff appealed that decision to the Swiss Court of Criminal Appeals.

58. A certified translation of the Appeals Court's Decision dated September 8, 2014, affirming the Prosecutor's decision, is attached herein at **Exhibit RR**. The Appeals Court found that there was no clear proof that a crime was committed in light of plaintiff's testimony in her marital case that she gave the jewelry to Topaze, and that the appropriate forum for her claims was a civil court proceeding.

59. On December 8, 2017, your deponent wrote to defendant, requesting an accounting and return of the jewelry in question. *See* attached **Exhibit SS**. Defendant did not respond to that letter, and plaintiff filed her lawsuit with this Court on February 5, 2018 [Document 1].

60. On March 2, 2018, the defendant was served with the Summons and Complaint in this action in Switzerland pursuant to the Hague Convention on the Service Abroad of Judicial and Extrajudicial Documents. The proof of service, filed with the Court [Document 13], is attached herein at **Exhibit TT**.

_____
David P. Marcus

Sworn to before me this 23rd
day of April, 2018.

_____
Notary Public

CALLY A. COUTURIER
NOTARY PUBLIC – STATE OF NEW YORK
No. 01BR6138404
QUALIFIED IN NIAGARA COUNTY
MY COMMISSION EXPIRES DECEMBER 19, 2021