

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NEW YORK

| | |
|---|---|
| BARBARA STEWART,<br><br>                    Plaintiff,<br><br>     v.<br><br>MICHELE STEWART a/k/a Michele Bouman-Stewart,<br><br>                    Defendant. | Civil Action: **1:18-cv-00201-GWC**<br><br>**AFFIDAVIT OF<br>MICHELE BOUMAN-STEWART** |

**I, MICHELE BOUMAN-STEWART**, hereby swear, under the penalty of perjury, the following:

1. I am a Dutch citizen (not Belgian) and a resident of Switzerland.

2. I reside at my home in Villars, in the Canton of Vaud, and have resided in Switzerland for 24 years.

3. I have personal knowledge of the facts set forth herein.

4. I submit this Affidavit in reply to Barbara Stewart's ("Plaintiff") Affidavit that she submitted in opposition to my Motion to Transfer Venue to the U.S. District Court for the Southern District of New York ("SDNY") and in reply to her Memorandum of Law.

**My Travel**

5. Despite Plaintiff's assertions to the contrary, I do not travel extensively.

6. I do travel to Spain from Switzerland two to three times per year with an average round trip flight of about $70. I travel to Spain to reduce my living expenses, as the cost of living in Spain is far less than the cost of living in Switzerland.



7. Living in Spain also allows me to reduce heating and food expenses that would be much greater in Switzerland, because food is less expensive in Spain and Spain is warmer than Switzerland.

8. I have only been to the United States six times in the past eight years. I have done so for special occasions as my children would mostly only be able to come back home to Switzerland once a year for Christmas.

9. I traveled to Poughkeepsie, New York a total of three times: in 2012 and 2013 to move my daughter into college at Vassar College in her freshman and sophomore years and in 2016 to attend her graduation.

10. I traveled to Colgate University in Hamilton, New York a total of two times: once in 2014 to move my son into college and once in 2018 for his graduation. When I visited Hamilton, New York for my son' graduation, I slept on campus to save money.

11. I do not frequently travel to Maine. I have traveled to Maine a few times in the past eight (8) years which always corresponded with my trips to move my children into college. We did so, so that my children could visit with their cousins, aunts and uncles and my former father-in-law and his new wife Maureen, just like we used to when Barbara Stewart was in Maine.

12. In August 2017, I made a separate trip to New York City to visit my daughter for her birthday and my son and I visited Maine on this trip as well.

13. Neither I, nor my ex-husband William P. Stewart, III ("Tres"), Plaintiff's son, paid personally for either of my children's college educations. Their grandfather William P. Stewart, Jr. ("Bill"), Plaintiff's ex-husband, paid for all of their college expenses through my former spouse's Trust until April 2015 as he is the Trustee and then through a college fund he had set up for each for his grandchildren at birth.

14. My son currently lives in London, but I have not visited him there since he graduated college.

15. My daughter presently lives in New Zealand and I have not visited her there either.

16. I never traveled to the United States for any of the lawsuits to which I have been a party or that involved the interminable Stewart inter-family disputes.

17. When I divorced Tres after he left us, the Swiss matrimonial court split our matrimonial assets and awarded me approximately CHF 1.2 million as well as CHF 12,000-15,000 per month of alimony for life, but Tres did not pay the CHF 1.2 million, and only paid the monthly alimony until April 2015. When I could not collect any of the money due from Tres on the Swiss Divorce Judgment, I domesticated the Swiss Divorce Judgment into a New York County, New York money judgment to try and collect from him in the United States and/or from his trust funds.

18. The Swiss Divorce Judgment was domesticated in New York County by my New York attorneys, but I did not have to appear in New York County for any Court proceeding related to the domestication action. To date, neither Tres nor his Trust has paid on his obligations on the domesticated Swiss Divorce Judgment, which now exceeds $1.5 million (with interest) in U.S. Dollars.

19. Travelling to the United States costs money and time. Traveling to New York County will be an inconvenience to me, but less of an inconvenience than traveling to Buffalo or Toronto and then driving to the WDNY.

20. The extra travel to the WDNY would be a greater inconvenience to me because it requires more travel time, connecting flights, and more expense as I would need to obtain hotel rooms for myself and my attorneys, as well as car rentals.

21. If this matter were to be in the SDNY I would have a place to stay in New York City and I would not have to incur expenses for my attorneys to travel to the WDNY. Plaintiff's suggestion that causing me to travel to the WDNY would "hardly" inconvenience me is simply thoughtless on her part and false.

22. As for my financial situation, I have no meaningful employment. I cannot find employment in Switzerland. I am over 45 years old and, and as a senior, the cost of social security and health insurance for Swiss employers is very high. Therefore, employers generally do not hire people over the age of 45.

23. I do own the jewelry at issue and it does have significant value (although I do not know the exact value of all the jewelry at this time). Plaintiff has some of the jewelry, which she refuses to account for.

24. Plaintiff has a 24.79 carat diamond emerald cut solitaire ring purchased for $2.5 million, which was owned by Topaze Investments, Ltd./DGBF Investments Ltd., and was discovered in Barbara's home in New York, New York. *See* Email string, dated June 2012, attached as Exhibit 1.

25. Plaintiff also has a pair of ruby earrings that she demanded from me under various threats and which I turned over to her under duress through Tres when he came to our daughters' high school graduation, valued in the amount of approximately $1.2 million. See Email Strings, from 2012 and 2013 as Exhibit 2.

26. Although the jewelry has value, and I have some of it in my possession, I do not wish to sell it to spend the proceeds on litigating a frivolous lawsuit against my disgruntled former mother-in-law whom I have loved very much and still care for.



27. I have been told for two decades by Plaintiff, Bill, and other Stewart Family members that even if Tres did not take care of his financial obligations towards me and our children, I would always have the jewelry from Topaze/DGBF that Plaintiff gave to me and that would be our safety net.

**Plaintiff's Travel and Financial Condition**

28. Throughout the many lawsuits Plaintiff has been involved in, the Courts have repeatedly rejected her testimony as being untruthful or containing fact omissions because she refused to produce relevant information such that the Courts could not determine whether she was telling the truth.

29. Plaintiff's suggestion that she has financial limitations can only be described as absurd. She lives in a well-appointed New York City apartment owned by her children's trusts that pay all of the associated living expenses. I understand that she had about $2,000 of flowers a month delivered to her apartment for decades, which ended in or around June 2018. Plaintiff has no living expenses other than food, as all her living expenses are covered by her children's trusts.

30. She acknowledges receipt of $1,764.20 per month in social security income or $21,170.40 per year. She receives income from another trust in which she is the sole income beneficiary for life. She admits that last quarter she received $13,501 from that trust, but that the amount varies and Plaintiff typically provides less than forthcoming information to Courts. My understanding is that she receives $17,000 to $20,000 per quarter. So on a yearly basis more like $68,000 - $80,000 from that trust.

31. She owns a significant portion of a flower farm business in Vietnam called Agravina with her former son-in-law Charles Target ("Target"). In the lawsuits where Plaintiff attempted to destroy her children's trusts so that she could have all of the money and assets for

herself, there was testimony about her financial interest in Agravina and in the divorce decision the Judge concluded her interest to be valued more than $4.0 million, but Plaintiff refused to disclose her financial interest in Agravina to the Court in the trust cases because doing so would have contradicted her claims of financial limitations.

32. I understand that as a result of her omissions and refusal to disclose her financial condition, the Courts entered adverse interests against her with respect to her financial condition.

33. Plaintiff has an extensive fear of flying and therefore typically flies on private jets or in first class, so her expense for flying from New York City to Buffalo would be considerably greater than any expense incurred by Mr. Marcus or Mr. Yankalunes having to fly to New York City, unless she does not plan on showing up.

34. It is my further understanding that Plaintiff last travelled to Europe for the month of August 2018, so incurring traveling expenses does not seem to be a financial impediment for her.

35. I recently learned that Plaintiff has given her interests in her chalets and the parcels of land that make up the compound upon which the chalets sit to Tres's underage children, with a life estate in favor of Tres. The chalets, called *Brebis Noire* and *Mouton Noir*[1], and the 2 parcels of land are in Villars, in the Canton of Vaud, in the same neighborhood as my home. See Swiss Land Records as Exhbit "3".

36. Although she gifted these properties, which have a total value in excess of $5.0 million, Plaintiff still stays at the *Mouton Noir* every time Barbara comes to Switzerland, and as recently as August 2018.

---

[1] Plaintiff shared ownership of Mouton Noir with Bill.



37.     It is inconceivable that Plaintiff could be claiming that she has financial limitations while at the same time she has recently given away millions in real estate to her grandchildren, all while continuing to have use of these assets as well as the pair of ruby earrings to her son Tres.

**Other Witnesses**

38.     The suggestion by Mr. Marcus that I have contradicted my prior position is false. The critical witnesses in this case are Plaintiff, myself, and Mr. Iglehart. Mr. Iglehart served as both Plaintiff, Bill and my attorney throughout these many years. My Motion to Change Venue from the WDNY to the SDNY does not veer from this position.

39.     Mr. Iglehart lives and works in Switzerland. All of his documents related to his representations of Plaintiff, Bill and me are in Switzerland. He will not likely be traveling to the United States for this case. Even though he served as my attorney and I have sought his legal advice related to this and other matters, I do not control Mr. Iglehart. While he did serve as a director under the Fiduciary Agreement related to Topaze that does not give me the power to compel him to the United States if he does not wish to come to the United States. Also, since Plaintiff keeps insinuating that Mr. Iglehart and I had an affair, the Court should know that I never had any type of romantic relationship with Mr. Iglehart, despite the lurid insinuations by Plaintiff. We have a professional relationship, and he provides me with guidance and legal advice. Since 1991, which is about 28 years, we have become comfortable in emails – this does not mean we had an affair, and the insinuations that we did are not appreciated and solely designed to impeach my credibility and his.



40. So Mr. Iglehart's testimony will need to be taken in Switzerland and presumably will need to be compelled.

41. Plaintiff made allegations in her opposition to my prior Motion to Dismiss that actions or activity relevant to this case took place in New York City. I did not agree with her claims, but they are her claims nonetheless. My position has been and remains that the relevant evidence regarding meetings with me, Plaintiff, and Mr. Iglehart all occurred in Switzerland. None of the meetings involving Mr. Iglehart ever occurred in New York or the United States.

42. At present, I do not recall ever having meetings in New York to discuss Topaze or the jewelry with Plaintiff or anyone else.

43. In fact, Plaintiff always directed me not to discuss any foreign assets with anyone, not even the other Stewart Family members, only Bill, Plaintiff and Mr. Iglehart.

44. To the extent that phone conversations occurred with Plaintiff in New York or emails were sent by Plaintiff from New York to me or Mr. Iglehart in Switzerland, then those calls or emails have a connection to New York City and Switzerland, not the WDNY.

45. Plaintiff's submissions to the Court and certain documents brought to light facts that Plaintiff conversed with Ralph Belfiore and Greta Gallas in New York regarding her financial accountings, including the treatment of the jewelry. These witnesses, while not as significant as Mr. Iglehart, will still be pertinent witnesses who will help establish facts regarding Plaintiff's ownership of the jewelry and the treatment of the jewelry on her books and records. These witnesses worked for the Stewart Family in New York City.

46. Bill will also be a witness and he will be called on to explain why the jewelry was transferred into Topaze in the first instance, as Plaintiff insists this was all his idea. Bill maintains an apartment in New York City.

47.   I frankly doubt that Greg would honor any request from Plaintiff to travel to Buffalo or Toronto to assist her in connection with this lawsuit. Greg has been involved in years and years of acrimonious litigation with his mother. Greg was involved in the process of insuring the items of jewelry and that process, will become important in establishing the jewelry that belonged to Topaze and now belongs to me. Greg lives in Ridgewood, New Jersey, just a few miles from New York City. Clearly he would be inconvenienced if he has to travel to Buffalo.

48.   Tres would, of course, travel wherever Plaintiff requests, and he may not feel inconvenienced at all by having to leave Connecticut to go to Buffalo, but his personal feelings are not relevant. Having to travel from Connecticut to Buffalo, as opposed to having to travel to New York City surely evidences a greater inconvenience.

49.   Target lives in Hong Kong, but the Stewart Family all knows and acknowledges that he remarried and his new wife makes her home in New Rochelle, New York, which is in the SDNY. Target may have pertinent testimony about the inception of Topaze. He may also be called to testify about Plaintiff's financial condition, if any issue related to her financial condition comes up again, as Plaintiff put that issue in contest on this motion. Target has extensive knowledge of Plaintiff's holdings in Agravina. Having his new wife's home in the SDNY surely makes that location more convenient for him than the WDNY.



Signed under the penalties of perjury.

Dated: February 7, 2019

_____
**Michele Bouman Stewart**

Subscribed and sworn before me this 7th day of February 2019.

Legalisation number 9'155.-

**JANA ROSSIER LÉGERET**, notary in Montreux, without engaging any responsibility on the content of the present document, does hereby certify, the authenticity of the signature applied here above, in her presence, by **Michèle Henriëtte BOUMAN**, based on a comparison of her signature applied on her passport.

Montreux, the seventh of February two thousand nineteen.

APOSTILLE
(Convention de La Haye du 5 octobre 1961)

1. Pays: SUISSE

   Le présent acte public
2. a été signé par .Jana Rossier Légeret..................
3. agissant en qualité de .Notaire.........................
4. est revêtu du sceau/timbre de .Jana Rossier Légeret - Notaire...

Attesté
5. à Lausanne       6. le ..7 février 2019..............
7. par la Chancellerie d'Etat du Canton de Vaud
8. sous No .1308.........
9. Sceau/timbre:              10. Signature
                              pr le Chancelier d'Etat:

                                   Yanick BRUHIN